**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| DANIEL GILLES and CARMEN BATTAGLIA, | Case No. 1:19-cv-01968 |
| Plaintiffs, | Judge J. Philip Calabrese |
| v. | Magistrate Judge Jonathan D. Greenberg |
| ANN MARIE DONEGAN, *et al.*, | |
| Defendants. | |

**OPINION AND ORDER**

This case stems from the arrest of Defendant Ann Marie Donegan on domestic violence charges, which were later dismissed. At the time, Ms. Donegan was the mayor of the City of Olmstead Falls and also served as the safety director for the City, which is also a Defendant in this case. Following Ms. Donegan's arrest, Plaintiffs, Chief of Police Daniel Gilles and Deputy Chief of Police Carmen Battaglia, claim that the mayor led a campaign of hostility and retribution against the police department because of their involvement in her arrest. Plaintiffs assert that Ms. Donegan's vendetta against them and the City's police department eventually led to their separation from employment with the City. After Plaintiffs' departure, Defendant William Traine became the City's Interim Chief of Police.

Interim Chief Traine conducted an internal investigation into Plaintiffs' handling of Mayor Donegan's case. After the investigation, Interim Chief Traine summarized the investigation and its findings at a press conference. Plaintiffs allege

that Interim Chief' Traine's statements defamed them and placed them in a false light by, among other things, accusing them of tampering with evidence and appalling police work. Plaintiffs sued Ann Marie Donegan, William Traine, and the City of Olmstead Falls, claiming that Defendants deprived them of procedural and substantive due process, defamed them, invaded their privacy, and breached a settlement agreement. They also allege spoliation of evidence. Each Defendant moves for summary judgement. For the reasons that follow, the Court **GRANTS IN PART** Defendants' motions for summary judgment.

## BACKGROUND

Construing the evidence in favor of Plaintiffs as the non-moving parties, the record establishes the following facts at this stage of the proceedings.

### A. Charges Against Mayor Donegan

On August 2, 2015, members of the police department of the City of Olmsted Falls were dispatched to Mayor Donegan's home in response to a report of suspected domestic violence by Mayor Donegan against her eleven-year-old son. (ECF No. 71-15, ¶ 5, PageID #2534.) Mayor Donegan refused to let the police into her home. (*Id.*, ¶ 7.) Then, Mayor Donegan's sister supplied evidence supporting suspicions of domestic violence that prompted her to call the police. (*Id.*, ¶ 8.)

Chief Gilles instructed his department to take the case to an outside prosecutor for impartial and independent review. (ECF No. 71-16, ¶ 8, PageID #2542.) The outside prosecutor recommended charges against Mayor Donegan for domestic violence, and an assistant county prosecutor seconded the recommendation. (*Id.*)

2

Mayor Donegan was arrested and charged with domestic violence and aggravated menacing. (*Id.*, ¶¶ 9 & 10, PageID #2542.) A special prosecutor and visiting judge were assigned to her case. (ECF No. 71-15, ¶ 12, PageID #2534.)

Eventually, the charges against Mayor Donegan were dismissed after the visiting judge ruled that the evidence used to arrest Mayor Donegan was inadmissible. (ECF No. 71-16, ¶ 10, PageID #2542.) Later, Mayor Donegan threatened suit and reached a settlement with the City. (ECF No. 64-8.) Although confidential, city council made public the agreement, including the consideration paid and other material terms, pursuant to Ohio's public records laws. (*Id.*, PageID #2038–40; ECF No. 63-15.)

### B. Mayor Donegan's Police Department Reform

Plaintiffs maintain that following these events, Mayor Donegan began to retaliate against them and the City's police department. (ECF No. 71-16, ¶ 11, PageID #2542–43.) Plaintiffs claim that Mayor Donegan changed work hours, sick-time, and complaint policies and procedures against fellow officers. (*Id.*) Mayor Donegan viewed these actions, which she championed as reforms even before the charges against her, as a key part of her initial election campaign to "enhance efficiency and professionalism of the police force." (ECF No. 62-1, ¶¶ 3–5, PageID #1619.)

Plaintiffs assert that Mayor Donegan's actions ultimately led to their premature exits from the City's police department. (ECF No. 52-4; ECF No. 59-1.) Citing a "campaign of harassment" by Mayor Donegan and Interim Chief Traine,

3

Deputy Chief Battaglia retired and left the force in January 2016. (ECF No. 59-1.) Subsequently, Mayor Donegan "suspended and dismissed" Chief Gilles on June 7, 2016 for incompetency, neglect of duty, insubordination, and other various infractions. (ECF No. 52-4.) Both Chief Gilles and Deputy Chief Battaglia reached settlement agreements with the City in connection with their departures. (ECF No. 71-16, ¶ 13, PageID 2543.) These settlement agreements established rights and relationships between Plaintiffs and the City, including pension and benefit rights, release and waiver of claims and actions against the City and its employees arising out of Plaintiffs' departure, and confidentiality with respect to the terms of the settlement agreements. (ECF No. 63-9; ECF No. 63-11.)

Following Deputy Chief Battaglia's departure, Mr. Traine, a retired Cleveland police officer and reserve officer with the City, was appointed as the Interim Deputy Chief on March 8, 2016. (ECF No. 65-2, ¶ 14, PageID #2122.) On June 7, 2016, he was promoted to the City's Interim Chief of Police. (ECF No. 65, PageID #2102.) The parties dispute the propriety of Mr. Traine's appointment. (ECF No. 73; ECF No. 77.) Construing the record in favor of Plaintiffs, the Court will assume without deciding that Mr. Traine was never the police chief of the City, as Plaintiffs contend.

### C. The Internal Investigation

When Mr. Traine became Interim Police Chief, he found in the Deputy Chief's desk—which Mr. Battaglia formerly used—a flash drive containing information regarding Mayor Donegan's domestic-violence case. (ECF No. 65-2, ¶¶ 10 & 11, PageID #2122.) Later, on June 1, 2017, the City's attorneys asked Interim Chief

4

Traine to obtain the file from Ms. Donegan's case, which he was told former Chief Gilles and Deputy Chief Battaglia had copied numerous times. (*Id.*, ¶ 13.) Interim Chief Traine, who by then had moved into the chief of police's office, which Mr. Gilles formerly used, discovered numerous documents and files concerning Ms. Donegan's case that were not included in the initial report. (*Id.*, ¶¶ 16–19, PageID #2122–23.)

Concerned about these discoveries, Interim Chief Traine compiled the evidence and conducted an internal investigation into the handling of Ms. Donegan's case. (*Id.*, ¶ 20, PageID #2123.) Before releasing his findings, Interim Chief Traine asked a city-appointed special prosecutor to review the report. (*Id.*, ¶ 24, PageID #2123.) This special prosecutor opined that the investigation established probable cause to arrest Mr. Gilles and Mr. Battaglia for tampering with evidence and that that the former's actions constituted a dereliction of duty. (ECF No. 65-2, ¶ 27, PageID #2124.)

### D. The Press Conference

Later, various members of the public demanded the release of Ms. Donegan's arrest records and settlement agreement with the City. (ECF No. 19; ECF No. 20.) On July 29, 2017, City Councilman Kevin Roberts submitted a public records request under Ohio law to obtain documents relating to Ms. Donegan's settlement agreement and arrest, threatening a lawsuit if the records were withheld. (*Id.*) At Ms. Donegan's direction, partial records of her settlement agreement and arrest were released, including the amount of the settlement. (ECF 52-9, PageID #834–38.)

Shortly thereafter, on August 31, 2017, Interim Chief Traine held a press conference at the direction of the City. (ECF No. 65-2, ¶¶ 28 & 29, PageID #2124.)

In his remarks, Interim Chief Traine noted that it was an election year and that he wanted to get the facts straight regarding Ms. Donegan's arrest. (ECF No. 63-17, PageID #1801.) Although he never mentioned Mr. Gilles and Mr. Battaglia by name, Interim Chief Traine stated that there was probable cause to bring charges of tampering with evidence against two supervisory officers of the City's police department at the time of Ms. Donegan's arrest. (*Id.*, PageID #1804.) Interim Chief Traine made these remarks while noting that the reviewing prosecutor advised the City not to pursue the charges based on that evidence. (*Id.*, PageID #1805.) He went on to say that the officers' investigation into Ms. Donegan was politically motivated and that the charges imposed were "trumped-up" in retaliation against the mayor. (*Id.*, PageID #1804–05.)

Following the press conference, Ms. Donegan lost her reelection campaign. (ECF No. 1, ¶ 26, PageID #14.) Plaintiffs allege that during the remainder of Ms. Donegan's term as mayor, she and Interim Chief Traine destroyed or altered evidence to interfere with or obstruct any potential action involving Plaintiffs. (*Id.*, ¶¶ 76–81, PageID #26.) But Plaintiffs have not proffered any documents or other evidence allegedly destroyed.

## PROCEDURAL HISTORY

In October 2017, Plaintiffs sued Defendants in State court. (ECF No. 71-1; ECF No. 71-2.) Both Plaintiffs asserted claims arising from Interim Chief Traine's press conference. (*Id.*) In their original complaints, Plaintiffs only asserted claims for defamation and breach of contract—their settlements with the City. (ECF

6

No. 71-5; ECF No 71-6.) After an unsuccessful attempt to amend their complaints to add claims for invasion of privacy, false light, and civil liability for criminal acts, Plaintiffs voluntarily dismissed on May 20, 2019. (ECF No. 71-14.)

On August 27, 2019, Plaintiffs refiled in federal court. (ECF No. 1.) Plaintiffs' complaint includes the following claims under Section 1983: (1) deprivation of procedural due process, asserted against all Defendants, and (2) deprivation of substantive due process, asserted against only Ms. Donegan and Mr. Traine; and under State law: (3) spoliation of evidence; (4) defamation; (5) invasion of privacy/false light; and (6) breach of contract. (*Id.*, PageID #16–27.) Plaintiffs assert that they have suffered injury to both their personal and professional reputations and seek to recover for alleged economic injuries, humiliation, and emotional distress. (*Id.*, ¶¶ 52, 60, 66, PageID #20–24.) They seek $50,000 in damages on all counts, attorneys' fees, punitive damages against Ms. Donegan and Mr. Traine, and equitable relief. (*Id.*, PageID #27.)

Previously, the Court dismissed Plaintiffs' Section 1983 claim against Defendant City of Olmstead Falls (Count I), reasoning that Plaintiffs suffered no deprivation of a property interest as a result of the press conference and, therefore, suffered no violation of a procedural due process right. (ECF No. 66.) Defendants now move for summary judgment on all counts. (ECF No. 62; ECF No. 64; ECF No. 65.)

7

ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, "the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. 574, 587 (1986)).

"The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Then, the non-moving party must "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson*, 477 U.S. at 250). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgement is not appropriate. *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250).

8

However, if the evidence "is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

"Just as plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned up). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

## I. Section 1983 Claims

In Counts I and II, Plaintiffs claim that Defendants deprived them of procedural and substantive due process because they were not afforded a name-clearing hearing after the August 2017 press conference. (ECF No. 1, ¶ 41, PageID #17–18.)

Section 1983 creates a cause of action against a person acting under color of State law who deprives a person of rights, privileges, or immunities guaranteed by the Constitution or federal law. 42 U.S.C. § 1983. Therefore, to find a person liable under Section 1983, the defendant must have (1) acted under color of State law and (2) deprived the allegedly injured party of rights, privileges, or immunities

9

guaranteed by the Constitution or federal law. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).

Here, both Interim Chief Traine and Mayor Donegan were acting under color of State law. While there is a dispute whether Mr. Traine was properly appointed as the interim chief of police (and the Court assumes he was not), there is no dispute that Mr. Traine was charged with and carried out the responsibilities and duties of the chief of police for the City during the relevant times. Further, because the City directed Mr. Traine to hold the press conference from which the claims in this case arise, the Court concludes that Mr. Traine was acting under color of State law when he made his remarks. As for Mayor Donegan, her involvement in the August 2017 press conference is disputed, but for the sake of this motion, there is no dispute that any action she allegedly took came when she served as mayor. Therefore, the question turns on whether the record would allow a reasonable jury to find that Ms. Donegan or Mr. Traine deprived Plaintiffs of their due-process rights.

**I.A.  Procedural Due Process**

Plaintiffs argue that they were deprived of procedural due process because they were not afforded a name-clearing hearing after Mr. Traine's 2017 press conference. "The Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest in [his] 'reputation, good name, honor, and integrity." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002). "[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Board of Regents v. Roth*, 408 U.S.

10

564, 573 (1972). "However, these protections are available only if the alleged reputational damage is accompanied by '[s]ome alteration of a right or status 'previously recognized by state law,' such as employment." *Meyers v. Village of Oxford*, 739 F. App'x 336, 338 (6th Cir. 2018) (quoting *Paul v. Davis*, 424 U.S. 693, 711-12 (1976)).

In other words, regardless of whether a plaintiff alleges "[a] charge . . . that might seriously damage [the plaintiff's] standing and associations in his community" or "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities," termination of employment or another change in status must accompany such allegations. *Id.*, 424 U.S. at 709–11. "To hold otherwise would 'convert[ ] every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.'" *Meyers*, 739 F. App'x at 339 n.3 (quoting *Paul*, 424 U.S. at 702); *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991).

On the record before the Court, the facts construed in favor of Plaintiffs do not support their claimed constitutional right to a name-clearing hearing. Each Plaintiff separated from employment with the city a year before the press conference at issue. (ECF No. 52-4; ECF No. 59-1.) Nor do Plaintiffs contend that some other change in status permits their procedural due-process claims to proceed. Without a change in status, the law makes clear that Plaintiff may not maintain this claim. For these reasons, as well as those set forth in the Court's Opinion and Order dated August 15, 2021 (ECF No. 66, PageID #2165–66), the Court determines that Defendants

Donegan and Traine are entitled a summary judgment as a matter of law on Plaintiffs' procedural-due-process claims.

### I.B. Substantive Due Process

Plaintiffs also assert a substantive due-process claim under Section 1983. They allege that Defendants violated their rights by depriving them of their reputations, good names, prospective job opportunities, and lost wages because of the August 2017 press conference.

Substantive due-process claims fall into two categories: (1) "claims asserting [a] denial of a right, privilege, or immunity secured by the Constitution or by federal statute other than procedural claims" and (2) actions by government officials that "shock the conscience." *Meritek v. Blalock*, 983 F.2d 1353, 1367-68 (6th Cir. 1993); *see also Braley v. City of Pontiac*, 906 F.2d 220, 224–25 (6th Cir. 1990); *Wilson v. Beebe*, 770 F.2d 578, 583 (6th Cir. 1985). Plaintiffs make no argument that the former category applies. (ECF No. 70, PageID #2203; ECF No. 71, PageID #2412–13.)

A high standard governs any determination of whether the conduct of governmental officials shocks the conscience. *See Garcia v. Thorne*, 520 F. App'x. 304, 309 (6th Cir. 2013). Conduct that shocks the conscience must be so severe "as to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights," and violate the decencies of civilized conduct. *Parate v. Isibor*, 868 F.2d 821, 833 (6th Cir. 1989) (quotation omitted); *see also Range v. Douglas*, 763 F.3d 573, 589-90 (6th Cir. 2014). The conduct must be "truly extraordinary in

12

nature." *Draw v. City of Lincoln Park*, 491 F.3d 550, 556 (6th Cir. 2007); *see also Garcia*, 520 F. App'x at 309.

Plaintiffs argue that Defendants' conduct shocks the conscience, particularly the statements Interim Chief Traine made at the press conference. Specifically, Plaintiffs point to the record (construed in their favor) showing that, notwithstanding a disputed appointment of Mr. Traine as interim chief, he appeared in a police uniform at the press conference, identified himself as the chief of police, and accused the police of investigating Ms. Donegan and lobbying city council for a special prosecutor to retaliate against the mayor for her police-reform agenda. (*See generally* ECF No. 71-21.) Further, he accused Plaintiffs of committing criminal acts—obstruction of official business, tampering with evidence, and malicious prosecution—and stated that their conduct appalled him. (*Id.*) He made these statements at the press conference knowing and intending them for wide circulation in the local media. (ECF No. 71-15, ¶ 23, PageID #2535; ECF No. 71-16, ¶ 21, PageID #2543; ECF No. 71-22; ECF No. 71-23; ECF No. 71-24.)

Without offering any commentary or judgment on the statements from the press conference, the statements at issue fall as a matter of law far below the high standard for showing a potential violation of Plaintiffs' substantive due-process rights—or even creating a genuine dispute of material fact for a jury on the question. Simply put, even if defamatory, these statements do not shock the conscience. *See Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996) (concluding that a track coach slapping a student in the face falls short of brutal or inhumane conduct

13

that shocks the conscience); *Vasquez v. City of Hamtramck*, 757 F.2d 771, at 772–73 (6th Cir. 1985) (concluding that an alleged malicious prosecution and issuing a warrant for unpaid parking tickets does not shock the conscience); *see also Garcia*, 520 F. App'x at 309 (concluding that multiple calls made by the police in the middle of the night does not shock the conscience); *Parate*, 868 F.2d at 832–33 (concluding that not renewing a contract of employment does not shock the conscience). Nothing said during the press conference violated the "decencies of civilized life" nor "transcend[ed] the bounds of ordinary tort law." Accordingly, Defendants' undisputed actions and relevant conduct fail to shock the conscience.

## II. State Claims

Because the Court dismisses each of the Plaintiffs' federal claims, the Court may, in its discretion, either retain jurisdiction over Plaintiff's State-law claims and proceed on the merits, *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009), or decline jurisdiction and dismiss the complaint without prejudice to Plaintiff's right to pursue the remaining claims in State court, *see* 28 U.S.C. § 1367(c)(3). "[G]enerally '[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims.'" *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 585 (6th Cir. 2011) (quoting *Musson Theatrical v. Federal Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996)); *see also Juergensen v. Midland Funding, LLC*, No. 5:18-cv-1825, 2018 WL 5923707, at *2 (N.D. Ohio Nov. 13, 2018). To determine whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case,

14

and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

After disposing of Plaintiffs' claims under Section 1983, the Court has weighed the principles of judicial economy, convenience, fairness, and comity.  Although judicial economy and convenience might weigh in favor of exercising supplemental jurisdiction, principles of fairness and comity cut the other way.  In the Court's view, the remaining State-law claims present matters best suited to resolution in the State courts that ought, in fairness, to be resolved there.  Therefore, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiff's State-law claims of defamation, invasion of privacy, breach of contract, and spoilation of evidence.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Defendants' motions for summary judgment on Plaintiffs' Section 1983 claims (Counts I & II) (ECF No. 62; ECF No. 64; ECF No. 65).  Further, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' State-law claims (Counts III–VI) and **DENIES WITHOUT PREJUDICE** Plaintiffs' motion for judicial notice (ECF No. 73).  Finally, the Court **DIRECTS** the Clerk to enter judgment accordingly.

**SO ORDERED.**

Dated: August 8, 2022

                                    J. Philip Calabrese
                                    United States District Judge
                                    Northern District of Ohio